Filed 5/27/21  P. v. Sydnor CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTJUAN SYDNOR,<br><br>Defendant and Appellant. | C085040<br><br>(Super. Ct. No. 15F0394) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY WAYNE JACOB,<br><br>Defendant and Appellant. | C085760<br><br>(Super. Ct. No. 15F03945) |

1

Defendants Anthony Wayne Jacob and Antjuan Sydnor entered the home of Jacob's friend Byron D., bound Byron and his girlfriend, and forced them to the floor. Defendants then beat Byron while repeatedly asking him for money. Byron was shot in the head and killed when he did not give them money.

Following a jury trial, Jacob was convicted of first degree murder with a felony-murder special circumstance (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17)), robbery (§ 211), and felon in possession of a firearm (§ 29800, subd. (a)(1)) along with enhancements for personally using a firearm (§ 12022.53, subd. (b)). He was sentenced to life without parole plus 10 years. Sydnor was convicted of first degree murder with the robbery special circumstance, robbery, and personally discharging a firearm causing death. (§ 12022.53, subd. (d).) He was sentenced to life without parole plus 25 years to life.

Jacob contends on appeal: (1) there was insufficient evidence to support the firearm use enhancement; (2) insufficient evidence supports the felony-murder special circumstance; (3) improper lay opinion of his guilt was admitted; (4) a witness's testimony that Jacob was on parole warranted a mistrial; (5) prejudicial disparaging comments about him were erroneously admitted; (6) the suppression motion regarding the use of his cell phone tracking information to locate him was improperly denied; (7) allowing re-argument in response to a jury question mandates reversal; and (8) the prosecutor committed misconduct by misstating the evidence during re-argument. In supplemental briefs he contends the matter should be remanded for the trial court to determine whether to exercise its discretion to strike the firearm enhancements, and the restitution fine, court operations assessment, and conviction assessment should be stayed pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

---

[1] Undesignated statutory references are to the Penal Code.

Sydnor contends allowing additional argument on the jury question violated his rights to counsel and to be present at a critical stage of the proceedings, the matter should be remanded to allow the trial court to exercise discretion over whether to strike the firearm enhancement, and his motion to suppress a search warrant executed in Philadelphia should have been granted.

The substantial evidence claims fail as they are based on taking a view of the evidence most favorable to the defendant. The trial court's admonishment cured any potential prejudice from the lay opinion evidence, and the statement that Jacob was on parole did not warrant a mistrial. Statements in a police interview showing the witness's anger at Jacobs were properly admitted as state of mind evidence. Using current GPS findings from Jacob's cell phone to find him did not warrant suppressing items seized pursuant to his arrest as Jacob had no reasonable expectation of privacy in his current location in public. Jacob's failure to object to the imposition of a $10,000 restitution fine forfeits any *Dueñas* issue. It was within the trial court's discretion to allow the additional argument requested by the jury to resolve an impasse regarding Jacob's firearm allegation, the prosecutor's supplemental arguments were not misconduct, and Sydnor was not deprived of his right to have counsel or be present at a critical stage of the proceeding. Finding substantial evidence supports denial of Sydnor's suppression motion, we shall remand for the trial court to exercise its discretion over the firearm enhancements and otherwise affirm.

BACKGROUND

*The Crimes*

On September 23, 2014, Regina C. was living in Sacramento with her boyfriend Byron D., her seven-year-old son, and her daughter. She was at home with her children that evening while Byron was in and out of the house running errands. Regina was in the master bedroom when she heard the alarm system beep as Byron opened the front door

3

upon returning home. She heard several voices talking with Byron in the living room; a voice she did not recognize called out to her, "Gina, Gina, Gina."

Suddenly, a skinny African-American man wearing a mask and all black clothing entered the bedroom and pointed a silver revolver at her. Regina complied with the man's order to get up and follow him. Walking down the hall, she saw a heavier set African-American man wearing all black clothes and a mask using duct tape to bind Byron's wrists behind his back. Both men wore white transparent latex gloves and appeared to be in their forties.

The thinner man duct taped Regina's hands behind her back, after which the two assailants ordered Byron and Regina to lie down. The men asked Byron, "Where's the money at?" Byron replied he did not have any money and did not know what they were talking about. After Byron told them he had $100 and his car keys in his pocket, the men took the money and started hitting him.

The men hit Byron for 10 minutes while repeatedly demanding, "Where's the money at?" One of the men left the room to check on Regina's daughter and to see if she had a cell phone. The men found her daughter in another room and threatened to put a gun down her throat. The men went to the garage for a while. Upon returning, they continued to ask Byron for money. They eventually shot Byron in the head.

The two men ran out of the house after they shot Byron. Regina loosened her restraints and went to check on her daughter. After moving her daughter into the bedroom, Regina heard the front door beep. Peeking out the door, she saw the skinnier man re-entering the house. Regina took her daughter and fled out of the bedroom window and ran to a neighbor's house.

Bresha D. called her father Byron that night. They conversed until Byron stopped talking to her and sounded like he was talking to somebody else. Bresha hung up after 30 seconds; the call lasted for two minutes 23 seconds. An hour and one half later, her Aunt called and said her father had been murdered.

4

In September 2014, Rosie Tamayo lived on the same street as Byron. On the 23rd at around 5:30 p.m., she saw two men run out of a house towards a van. The driver was an African-American man with a long white beard, who was taller than five foot nine inches and had a built frame. Both men wore black hooded sweatshirts with the hoods over their heads.

Deputies from the Sacramento County Sherriff's Department arrived at around 5:44 p.m. They found Byron in the living room, laying on his stomach with his hands duct taped behind his back. He was pronounced dead at the scene. Grocery bags and a roll of duct tape were found near his head, and a .45-caliber casing from a semiautomatic firearm was on the living room floor.

*The Investigation*

Video surveillance from a nearby gas station showed Byron's Ford Expedition driving towards his house at 4:49 p.m. on the night of September 23rd. A van consistent with the one described by Tamayo drove towards Byron's house at 4:51 p.m. The van pulled into a gas station at 5:02 p.m. and left two minutes later. The van next drove towards Byron's home at 5:12 p.m. Byron's Expedition arrived home at 5:15 p.m. The van subsequently left the neighborhood and returned around the time of the home invasion, then leaving around the time of the murder.

A partial license plate number from the van in the video surveillance allowed Sacramento County Sherriff's Detective Tony Turnbull to determine it was registered to Lisa Jacob. Lisa was Jacob's ex-wife and affirmed the van in the video was hers. She allowed defendant to drive the van and he had access to it in September 2014, as he was helping her move. Cell phone records showed that Lisa was calling Jacob at the time; there were also calls and text messages between Jacob and Sydnor within a week of the murder. A warranted search of the van found an envelope named "Tony Jacob" holding flight vouchers and a registration card with Jacob's name.

5

Using cell phone tracking information, Detective Turnbull was able to locate and arrest Jacob on October 2, 2014. Upon being arrested, Jacob called Lisa from jail and told her to have his sister sweep up the house. A warranted search of Jacob's residence found 21 ecstasy pills, 3.5 grams of methamphetamine, 28.33 grams of an undetermined tan powder, and a blue pill containing an undetermined substance. The search also found a medical marijuana application in Jacob's name listing the address as his, a large number of latex gloves, airline vouchers similar to the one found in the van, and several .45-caliber bullets that were a different brand and color than the one found at the murder scene.

Jacob and Sydnor both owned multiple cell phones under different accounts. On September 18 and 19, 2014, Jacob received text messages from Sydnor that he was traveling from Philadelphia to Sacramento.[2] On September 18, at 5:57 p.m., Sydnor texted Jacob informing him he was in Phoenix and had to see if a seat was available; at 9:43 p.m., he texted, "here." Cell tower information shows Sydnor's phone traveled from Philadelphia to Phoenix to Sacramento, with times consistent with his texts to Jacob. Cell tower information showed on September 20, Jacob's phone went from Sacramento through Woodland and Red Bluff to Redding. The phone returned from Redding to Sacramento the next day. Sydnor's phone was off during this time.

On September 21, 2014, Sydnor texted Jacob at 12:02 p.m., "Yo, Broah, Mya here laying ur driveway." Jacob responded a minute later, "she, her inquiring." Cell tower information placed both at Jacob's residence during this text conversation. Cell tower information placed Jacob's phone on the street of Byron's residence at the time of the murder. The phone then moved to another location. Jacob's phone contained deleted e-mails from Priceline on September 24 regarding his upcoming trip to Philadelphia on

---

**2** Sydnor lived in Philadelphia.

September 24, the itinerary for the trip, and asking about his rental car experience at Sacramento International Airport.

Cell tower information showed Sydnor made calls from the area of Jacob's home around midnight on September 24, 2014. Sydnor's phone stayed around Jacob's residence until the day after the murder, when it returned to Philadelphia through Chicago. Sydnor's phone went to an area in Philadelphia consistent with his residence. Sydnor's phone account closed on the day Jacob was arrested.

Tamayo identified Sydnor as the driver of the van in a photographic lineup. Sydnor was on federal probation from 2011 to March 2, 2015. His probation officer identified him as the driver of the van from an enhanced photo taken from the surveillance footage.

A search warrant was executed on Sydnor's Philadelphia residence. The search found a cell phone with a text message sent to Sydnor on May 14, 2015, stating, "Anthony Jacob REG 38922-060," with an attached picture indicating an address to send correspondence to inmates at the jail where Jacob was incarcerated. Also on May 14, Sydnor texted a picture showing how to send money to an inmate, with the attached message, "Send it quick collect." On July 5, Sydnor sent a message to a "Boo" directing the recipient to send money to Jacob via Western Union. Flight records showed Sydnor booked a flight on September 18 from Philadelphia to Sacramento with a layover in Phoenix. Sydnor was scheduled to return to Philadelphia on September 25, but the ticket was never used. DNA from the duct tape on Byron's wrists matched Sydnor's.

Jacob's girlfriend Margarette Cleaves had met Sydnor once in the six years she knew Jacob. She knew Jacob and Sydnor were friends and Jacob was the godfather of Sydnor's child. After his arrest, Jacob called Cleaves on October 5, 2014, and had her call a number and let "him" know Jacob was in jail. Cleaves called Sydnor to help with money for bail and an attorney for Jacob; Sydnor sent money to her.

7

Cleaves called Sydnor's phone from October 3, 2014, to December 2, 2014. Sydnor sent a text message to Cleaves asking her to call him on April 4, 2015. Another text that day asked her to give Sydnor information so he could "put something on the wire for him." Cleaves texted Sydnor her bank account number the next day. Sydnor texted Cleaves on May 14, 2015, that he was "trying to send main man some paper but it keeps saying wrong account number, so can you please send me right one ASAP."

Anajee Gardner dated Jacob in September 2014. A search warrant was executed on her apartment on July 8, 2015; it found firearms. She claimed Jacob brought the guns for a hunting trip and left them at her apartment.

In a July 15, 2015 interview with Sacramento County Sheriff's Detective Kenneth Clark Gardner admitted sending a text message to Jacob stating, "Your guns are sitting on the front porch. I don't give a F*** about them. Whoever takes them. I don't care. Free rein since we're done." During the interview, she identified Byron as the victim of the homicide. Gardner identified a picture of Sydnor as Jacob's friend from Philadelphia who flew out to Sacramento to buy pounds of marijuana. Jacob told Gardner that Jacob was the only person Sydnor knew in Sacramento, and Sydnor was out in Sacramento "buying with me." She recognized the van in the picture and said Jacob told her he was helping Lisa move. Sydnor was staying at Jacob's home at the time.

Gardner went to Redding with Jacob and Sydnor a couple of days before the murder. Upon returning from Redding, Jacob told her about items that were stolen from his Sacramento residence while they were in Redding. Jacob said he knew Byron was responsible because he told Byron about the Redding trip. He told Gardner he was going to take care of Byron. Byron was murdered two days after they returned from Redding.

Gardner confronted Jacob the morning after the murder when she saw a news story about Byron's death. Jacob said, "We're not going to talk about it. Don't ever tell anyone that." She asked Jacob about Sydnor; he said, "Oh yeah, I had to get him out of

8

here." Gardner had seen Jacob with guns other than those found in the search warrant. She described a black semiautomatic gun and a silver revolver with a brown handle.

Gardner, who talked to Jacob after his arrest, testified that she lied during the interview to avoid getting into trouble.

Regina testified that Byron knew Jacob. They were friends; Byron had stayed the night at Jacob's house. Jacob lived near Byron and had sold him a truck that summer. Regina went with Byron to give him the money for the truck, but could not find his house. Byron eventually found the house and told Regina he had paid the money. Jacob was not one of the men who came into the house. The man who got her was dark-skinned with thick eyebrows.

*Defense Evidence*

Detective Turnbull was called by Jacob and testified that a crime lab can differentiate between a bullet fired from a polygonal-style handgun. The detective who interviewed Gardner did not tell him that Gardner used the term "Glock" in describing the handgun she saw at Jacob's house.

DISCUSSION

I

*Sufficient Evidence of Firearm Use*

Jacob contends there is insufficient evidence to support his firearm enhancements.

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed for insufficient evidence unless it appears " 'that upon no

9

hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Enhancements are reviewed for substantial evidence under the same standard as for criminal convictions. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Jacob sustained an enhancement for personally using a firearm. (§ 12022.53, subd. (b).) He asserts there is insufficient evidence he personally used a firearm because Regina testified Jacob was not in her home during the homicide. In support of this contention, Jacob notes no other witnesses placed him at the crime scene and there was no other direct evidence he was there such as DNA evidence or admissions by him to investigators.

Regina testified that Byron and Jacob knew each other, that two men participated in the attack, and both were armed. The jury could believe the parts of Regina's testimony describing the attack and Jacob's knowing Byron and disbelieve her claim that Jacob was not one of the assailants. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 [trier of fact may credit part of witness's testimony and reject other parts].) Evidence shows the attackers used the van belonging to Jacob's ex-wife, that he had her permission to use it, and items associated with him were found in the van. Sydnor's DNA was found on the duct tape at the scene and he was identified as the van's driver. There is also evidence that Jacob had a close personal and business relationship with Sydnor, had arranged for him to come from Philadelphia to Sacramento, and traveled with him and Gardner to Redding just before Byron's murder. Gardner's statement to law enforcement shows Jacob had motive to commit a home invasion robbery and murder against Byron, Jacob's belief that Byron stole from him while he was in Redding. While bullets found in Jacob's residence were of a different color than the one at the murder scene, it was the same caliber, supporting an inference that Jacob possessed a gun of the same caliber as was used to kill Byron. This inference is further supported by Gardner's statement that

10

Jacob possessed guns other than the ones found at her residence, including a silver semiautomatic handgun.

Jacob's contention can succeed only if we view the evidence in the light most favorable to the defense, which we cannot do. Viewed most favorably to the judgment, substantial evidence supports concluding Jacob participated in the attack and personally used and discharged a firearm, causing Byron's death. Substantial evidence supports the enhancement.

## II

### *Substantial Evidence of Felony Murder*

Jacob contends there is insufficient evidence that the murder was intended to facilitate the robbery to support the felony-murder special circumstance.

The felony-murder special circumstance applies if "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" an enumerated felony, here robbery. (§ 190.2, subd. (a)(17)(A).) Jacob's claim is based on a rule that has its origin in the cases of *People v. Green* (1980) 27 Cal.3d 1, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 234 and *People v. Thompson* (1980) 27 Cal.3d 303, disapproved on other grounds in *People v. Rowland* (1992) 4 Cal.4th 238, 260. "*Green* and *Thompson* stand for the proposition that a murder is not committed during a felony for purposes of the special circumstance unless it is committed to carry out or advance the commission of the felony. In other words, as applied here, the jury could not find true the robbery or burglary special circumstances if the robbery or burglary was 'merely incidental to the commission of the murder.' [Citation.]" (*Garrison* (1989) 47 Cal.3d 746, 791 (*Garrison*).)

Jacob claims the intent behind the attack was murder and the robbery was merely incidental to the murder. There is evidence Jacob thought Byron stole items from him. Before Byron was shot, defendants repeatedly demanded he give them money as they

11

struck him. They demanded money after initially restraining him and placing him on the floor with Regina, and continued to make these demands after going into the garage for a while and then returning. They also took $100 and Byron's car keys from him before going to the garage. Byron was killed only after defendants returned from the garage and continued to demand money. From this, the jury could reasonably conclude that defendants formed an intent to rob Byron, and did not decide to kill him until they concluded he would not give them all the money they wanted.

Here, as in *Garrison*, there was no evidence that defendants' primary purpose was to kill rather than to steal (as in *People v. Green, supra*, 27 Cal.3d at p. 55), nor was there any serious question whether the perpetrators had any intent to steal at all (as in *People v. Thompson, supra*, 27 Cal.3d at p. 324), and "the record here establishes that the robbery was not merely incidental to the killings but was instead the primary purpose of the enterprise." (*Garrison, supra*, 47 Cal.3d at p. 791.) Substantial evidence supports the true finding on the special circumstance.

### III

### *Lay Opinion of Guilt*

A. *Background*

During cross-examination of Regina, Jacob's counsel elicited from her that her social media searches for possible suspects were not performed at the instigation of or on behalf of Jacob's counsel. Jacob's counsel then asked Regina if she had refused to talk to counsel before trial. She replied, "And the reason why I said that is because even though I believe Jacob wasn't in the house, I believe he is the one who set the whole situation up." Counsel immediately moved to strike. The trial court struck the comment, stating, "The question was a simple 'yes.' " Regina replied, "Please stop looking like you don't know."

The following day, the trial court reminded the jurors that Regina's comments had been stricken as unresponsive, and directed the jury not to consider, discuss, or be

influenced by stricken testimony.  It further instructed the jury that a witness's testimony was limited to personal knowledge, and lay opinion or belief was inadmissible as it intruded on the jury's factfinding function as well as having no probative value.

B.  *Analysis*

Jacob contends Regina's comments inflicted irreparable harm to him, and trial counsel should have requested a mistrial that the trial court was obligated to grant. Recognizing that trial counsel's failure to request a mistrial forfeits the issue (*People v. Harris* (2013) 57 Cal.4th 804, 849), Jacob claims the failure to raise a mistrial motion was ineffective assistance.

A witness cannot express an opinion concerning the guilt, innocence, or truthfulness of a defendant.  (*People v. Torres* (1995) 33 Cal.App.4th 37, 46.)  While the statement was inadmissible, the trial court promptly struck it and subsequently reminded the jury it could not use the statement in any way and explained why the lay opinion evidence was inadmissible.  There is no reason to believe the jury would not follow the court's instructions, which cured any potential prejudice from the improper lay opinion testimony.

"Counsel is not ineffective for failing to make frivolous or futile motions. [Citation.]"  (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  Finding a mistrial motion here would be futile, we conclude Jacob's counsel was not ineffective in declining to move for a mistrial on this ground.

IV

*Jacob's Parole Status*

A. *Background*

During redirect, the prosecutor elicited from Lisa Jacob that she had a problem with Jacob borrowing her van because she was responsible for it.  The prosecutor then asked why she had earlier testified that Jacob could use it if he needed the van.  She

13

replied, "Well, yeah, because he was on parole. So there's been occasions when he used my car to go to the, you know, parole office, but not just take my — just take my stuff."

Jacob's counsel moved for a mistrial the next morning. Counsel recognized there would be a stipulation that Jacob had suffered a prior felony conviction, but since that conviction was in 1990, his parole status added a recency that interfered with Jacob's right to a fair trial, warranting a mistrial. The trial court stated it understood that counsel may have refrained from a contemporaneous objection to avoid highlighting the comment to the jury. It also said it would admonish the jury now or later as counsel preferred. Counsel asserted this comment, unlike Regina's comment about Jacob's guilt, was solicited. The court stated it would admonish the jurors only if requested, and the matter was not discussed or acted on any further.

Later, the jury was informed the parties stipulated to Jacob suffering a prior felony conviction on June 8, 1990, in Monterey County. The court instructed the jury to consider the stipulation for the sole purpose of Jacob's convicted felon status regarding his felon in possession of a firearm charge.

B. *Analysis*

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial. [Citation.]" (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

Gratuitous testimony that a criminal defendant is on parole is improper. (*People v. Stinson* (1963) 214 Cal.App.2d 476, 481-482.) This situation is analogous to the erroneous admission of evidence, which does not require reversal unless it is reasonably probable that the appellant would have obtained a more favorable outcome had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) And, "[a]bsent fundamental unfairness," as here, the erroneous admission of evidence does not rise to a

constitutional violation involving due process or fair trial.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

The mention of Jacob's parole status was brief and was not further mentioned before the jury.  As discussed in our analysis of Jacob's substantial evidence claims, there was considerable evidence of Jacob's guilt, and Jacob's status as a felon was not hidden from the jury for the purposes of the felon in possession charge.  It was well within the court's discretion to conclude an admonition would cure any prejudice, and mistrial therefore was not warranted.

V

*Disparaging Comments by a Witness*

In her interview with law enforcement, Gardner said about Jacob, "Fucking Tony. Dumbass."  During pretrial proceedings regarding Gardner's interview, Jacob objected to the statement, asserting Gardner's opinion regarding Jacob's character was irrelevant. The trial court overruled the objection, finding the statement an expression of concern that Jacob was going to get her prosecuted for having his guns at her house, making the statement sufficiently relevant to her state of mind to outweigh any prejudice.

Jacob contends this was inappropriate character evidence that should have been excluded under Evidence Code sections 1101 and 352, as a matter of due process.  He finds the alleged error also deprived him of his Sixth Amendment right to a jury trial as the statement constituted lay opinion of his guilt.

Evidence Code section 352  provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  An appellate court reviews a trial court's rulings under Evidence Code section 352 for abuse of discretion, and will reverse only if the court " ' "exercised its discretion in an arbitrary,

15

capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

As the trial court correctly reasoned, the statement was relevant by explaining Gardner's state of mind when she made the statement. Gardner's anger at defendant at the time of her police statement gave an important context as to why she made it, which was particularly important where, as here, she recanted the statement in her trial testimony. An ex-girlfriend's statement of anger and exasperation at Jacobs for leaving his firearms at her home and thus subjecting her to police scrutiny was not evidence of his bad character or her lay opinion of his guilt. It was not an abuse of discretion for the trial court to conclude that whatever prejudicial effect of Gardner's statement was outweighed by its clear probative value.

Since the evidence was properly admitted, Jacob's constitutional claims fail as well. (See *People v. Harris* (2005) 37 Cal.4th 310, 336 ["the application of ordinary rules of evidence does not implicate the federal Constitution"].)

VI

*CSLI Information*

Jacob contends the trial court erred in denying his motion to suppress all items taken pursuant to his arrest on the ground that he was apprehended based on the use of cell site location information (CSLI) taken from his cell phone without a warrant. We disagree.

A. *Background*

Jacob filed a motion to suppress items seized pursuant to his arrest, asserting his location was discerned through the illegal use of CSLI information without a warrant. The following was presented at the suppression hearing.

During the initial investigation of the murder, Regina related to Detective Turnbull that she was afraid of being killed by the two people who committed the crimes. She moved out of the house shortly after the homicide and never returned.

16

On September 30, 2014, Detective Turnbull conducted a warranted search on the van suspected to have been involved in the murder and learned of a phone number that could be associated with Jacob. Jacob also had an outstanding federal arrest warrant. The following day, he learned Jacob had access to the van and had another phone number.

On October 2, 2014, Detective Scott Gurnaby filed emergency applications for pen register, trap and trace, location, and/or GPS position information on Jacob's phones with Sprint and T-Mobile. The T-Mobile application asserted Jacob was a strong person of interest in a murder, that the suspects knew an eyewitness to the murder, and they attempted to come back into the house, to get her, in the eyewitness's opinion. Although the T-Mobile application contained the assertion that the subject was an extreme threat to law enforcement and the general public, Detective Gurnaby knew of no information supporting this assertion other than the general nature of the crimes. Detective Turnbull believed Jacob posed an extreme threat to law enforcement and the public based on his criminal history and the nature of the current offenses. Detective Turnbull testified that the T-Mobile application included a statement that the suspect knew the surviving eyewitness to the murder because she said that the suspect had called out her name. He admitted Regina never told him that she knew the suspect. Detective Gurnaby was legally required to get a court order within 48 hours of submitting the application to the cell phone carrier. He took probable cause statements in support of the court orders when he made the request to the judge. The probable cause statement in support of the Sprint application related Jacob's federal arrest warrant and that he was wanted for questioning in a September 23, 2014 homicide. Jacob's sister Debra Jacob had him on her T-Mobile family plan. Only Jacob had access to the phone used on the account, and he paid his share of the bill.

Information from T-Mobile initially placed defendant's phone near his residence. A second request was then made to T-Mobile. Information from T-Mobile placed Jacob

17

in the area of Florin Road and Stockton Boulevard; several officers, including Detective Gurnaby, were dispatched to the area and Jacob was arrested there. The T-Mobile phone used to track Jacob was found in the car he was in at the time. Jacob's Sprint phone was turned off and not providing tracking information at the time.

A judge signed the order on October 3, 2014, the day after Jacob's arrest. After Jacob's arrest, a search warrant for his residence was procured and served.

Relying on federal cases holding that a person does not have a reasonable expectation of privacy of location information obtained through a cell phone, the trial court denied the suppression motion.

B. *Analysis*

Jacob contends he had a reasonable expectation of privacy in his CSLI. He claims no exigency supported proceeding without a warrant because the case was nine days old when the cell phone information was used to find him, and there was no case-specific information to support the claim he was a threat to the public or law enforcement. He claims the relevant application presented materially inaccurate information to the cell phone providers and to the judge who ruled on the application. Asserting that a United States Supreme Court case decided after the initial briefing (*Carpenter v. United States* (2018) 585 U.S. __ [201 L.Ed.2d 507] (*Carpenter*)) is dispositive, he concludes the denial of his suppression motion was reversible error.

1. *General Principles*

"In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure. [Citation.]" (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922.)

"A search compromises the individual interest in privacy; a seizure deprives the

individual of dominion over his or her person or property.  [Citation.]" (*Horton v. California* (1990) 496 U.S. 128, 133 [110 L.Ed.2d 112, 120].)  Typically, "[a] 'search' occurs 'when an expectation of privacy that society is prepared to consider reasonable is infringed.  [Citation.]" (*United States v. Karo* (1984) 468 U.S. 705, 712 [82 L.Ed.2d 530, 539].)

Even if the government does not intrude upon property, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.  [Citation.]" (*Kyllo v. United States* (2001) 533 U.S. 27, 33 [150 L.Ed.2d 94, 101].)  Likewise, an intrusion on a protected area such as a home will not be deemed a search "unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'  [Citation.]" (*Ibid*.)

The Fourth Amendment generally does not protect "[w]hat a person knowingly exposes to the public, even in his own  home or office." (*Katz v. United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 511].)  Accordingly, at the time the detectives used the cell phone information to locate Jacob, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.  [Citations.]" (*Smith v. Maryland* (1979) 442 U.S. 735, 743-744 [61 L.Ed.2d 220, 229] (*Smith*).)

For example, a person being investigated for tax evasion and whose bank records had been subpoenaed, could "assert neither ownership nor possession" of those records because they were "the business records of the banks," not his private papers. (*United States v. Miller* (1976) 425 U.S. 435, 440 [48 L.Ed.2d 71, 77-78] (*Miller*).)  Likewise, the Supreme Court held in *Smith* that is was not a search for the Government to use a pen register to record the outgoing calls because the defendant did not have a legitimate expectation of privacy in the numbers he dialed. (*Smith, supra*, 442 U.S. at pp. 742-743.)  In essence, one assumed this risk of disclosure when dialing a number out. (*Id.* at p. 744.)

## 2. *Carpenter*

*Carpenter* addressed "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." (*Carpenter, supra,* 585 U.S. at p. __ [201 L.Ed.2d at p. 515].)  It involved a suspect in a series of robberies who "identified 15 accomplices who had participated in the heists and gave the FBI some of their cell phone numbers; the FBI then reviewed his call records to identify additional numbers that he had called around the time of the robberies." (*Id.* at p. __ [201 L.Ed.2d at p. 515].) Pursuant to the Stored Communications Act (see 18 U.S.C. § 2703), the government obtained United States Magistrate orders directing Carpenter's wireless carriers to divulge 152 days of CSLI information from one carrier and two days of such information from the other. (*Carpenter*, at p. __ [201 L.Ed.2d. at pp. 515-516].)  Carpenter's motion to suppress this information was denied before his trial on federal firearm and robbery charges. (*Id.* at p. __ [201 L.Ed.2d at p. 516].)  Through expert testimony, the Government used the CSLI information to place Carpenter where the various robberies were at the time of each robbery. (*Id.* at p. __ [201 L.Ed.2d at p. 516].)

The Supreme Court declined to extend *Smith* and *Miller* "to the collection of CSLI." (*Carpenter, supra*, 585 U.S. at p. __ [201 L.Ed.2d at p. 525.)  It found the "third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another," (*Id.* at p. __ [201 L.Ed.2d at pp. 523-524]) but voluntary exposure does not "hold up when it comes to CSLI." (*Id.* at p. __ [201 L.Ed.2d at p. 524].)  In so holding, the Supreme Court relied on the pervasive, indispensable part cell phones played in everyday life, and on the fact that CSLI data was logged by the carrier without any affirmative act by the customer, who would have to turn the phone off to prevent the data from being recorded. (*Id.* at p. __ [201 L.Ed.2d at pp. 524-525].)

Whether a person had a reasonable expectation of privacy in CSLI data was governed by two cases. *United States v. Knotts* (1983) 460 U.S. 276 [75 L.Ed.2d 55] held the use of a beeper to track a vehicle through traffic was not a search because "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." (*Id.* at p. 281; *Carpenter, supra*, 585 U.S. at p. __ [201 L.Ed.2d at pp. 518-519].) "Since the movements of the vehicle and its final destination had been 'voluntarily conveyed to anyone who wanted to look,' Knotts could not assert a privacy interest in the information obtained. [Citation.]" (*Carpenter*, at p. __ [201 L.Ed.2d at p. 519].)

In the second case, *United States. v. Jones* (2012) 565 U.S. 400 [181 L.Ed.2d 911], the Supreme Court held that attaching a GPS tracking device to a vehicle in order to remotely track it for 28 days constituted a search. (*Id.* at pp. 402, 404 [181 L.Ed.2d at pp. 916-917, 918]; see *Carpenter, supra*, 585 U.S. at p. __ [201 L.Ed.2d at p. 519].) The Supreme Court in *Carpenter* found that five Justices in *Jones* "agreed that related privacy concerns would be raised by, for example, 'surreptitiously activating a stolen vehicle detection system' in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone. [*Jones,*] at 426, 428 (Alito, J., concurring in judgment); *id.*, at 415 (Sotomayor, J., concurring)." (*Carpenter,* at p. __ [201 L.Ed.2d at p. 519].) *Carpenter* also notes that these concurring opinions in *Jones* concluded that " 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy' — regardless whether those movements were disclosed to the public at large. *Id.*, at 430 (opinion of Alito, J.); *id.*, at 415 (opinion of Sotomayor, J.)." (*Carpenter, supra*, 585 U.S. at p. __ [201 L.Ed.2d at p. 519].)

The Supreme Court held in *Carpenter* that accessing seven days of CSLI information to get a record of Carpenter's movement at the time constituted a Fourth Amendment search. (*Carpenter, supra*, 585 U.S. at p. __ & fn. 3 [201 L.Ed.2d. at p. 521 & fn. 3].) This was in accordance with the reasonable expectation of privacy before the

pervasive use of cell phones and their tracking data. "Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.' [Citation.] For that reason, 'society's expectation has been that law enforcement agents and others would not — and indeed, in the main, simply could not — secretly monitor and catalogue every single movement of an individual's car for a very long period.' [Citation.]" (*Id*. at p. __ [201 L.Ed.2d at p. 521].) Since this use of CSLI information was a search, a warrant was necessary; the federal statutory procedure for obtaining CSLI data was insufficient to protect Carpenter's Fourth Amendment privacy interests. (*Carpenter,* at p. __ [201 L.Ed.2d at p. 525].)

There are limits to *Carpenter's* scope. The Supreme Court declined to "decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be." (*Carpenter, supra*, 585 U.S. at p. __, fn. 3 [201 L.Ed.2d. at p. 521, fn. 3].) *Carpenter* also did not change the rule exempting certain exigent circumstances from the warrant requirement; CSLI information could be obtained without a warrant under such exigencies. (*Id.* at p. __ [201 L.Ed.2d at p. 527].)

### 3. *Contemporaneous CSLI*

We decide Jacob's claim on narrow grounds. We do not determine here whether the exigent circumstances of his being a potentially armed suspect in a murder case who left a living eyewitness provides exigent circumstances justifying a warrantless search. Likewise, we do not determine whether Jacob's outstanding federal arrest warrant dissipates the taint of finding out his location through an unlawful search. (See *People v. Brendlin* (2006) 45 Cal.4th 262, 271 ["an arrest under a valid outstanding warrant — and a search incident to that arrest — is an intervening circumstance that tends to dissipate the taint caused by an illegal traffic stop"].) We also decline to determine whether the use of contemporaneous CSLI information to find someone is in general not a search.

22

Here, we hold only that Jacob did not have a reasonable expectation of privacy in determining his current location through the use of CSLI data, based on the particular facts of this case.

Although *Carpenter* informs our analysis, it does not govern here as this case involves the use of real-time CSLI information to find a suspected murderer with an outstanding arrest warrant. *Carpenter* was based in part on the traditional expectation of privacy in keeping one's long term movements from government observation. Using CSLI to find the current location of an individual does not implicate the same privacy interests underlying the analysis in *Carpenter*.

The CSLI data was used here to find a proximate location for Jacob, to which officers were dispatched and he was found in his automobile. Jacob had no reasonable expectation of privacy in his current location as he was traveling in public. "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both occupants and its contents are in plain view. [Citation.] 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' [Citations.]" (*Cardwell v. Lewis* (1974) 417 U.S. 583, 590-591 [41 L.Ed.2d 325, 335].) Whatever expectation of privacy society would be willing to accept in such circumstances is further diminished by the fact that he had an outstanding felony arrest warrant and was a suspect in an armed home invasion robbery-murder in which he and his accomplice left a living eyewitness.

Since Jacob did not have a reasonable expectation of privacy in his current location under these circumstances, the use of real-time CSLI data to track him did not require a warrant. We do not address whether obtaining real-time CSLI is ever a search or if real-time CSLI can be used to track a cell phone, and presumably its user, into a private home or business. (Cf. *United States v. Karo, supra,* 468 U.S. at p. 714 [82 L.Ed.2d 530, 541] [law enforcement's monitoring of a beeper, which had been installed on can of ether with the owner's consent before its transfer to a suspected drug trafficker,

inside "a private residence, a location not open to visual surveillance, violate[d] the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence"].)  Nor do we hold that use of real-time CSLI to track a person over a more extended period would not constitute a search.  We simply hold that under these facts, a warrant was not required to use real-time CSLI in order to find Jacob.

## VII

### *Dueñas*

The trial court imposed a $10,000 restitution fine (§ 1202.4) a $120 court operations assessment (§ 1465.8) and a $90 facilities assessment (Gov. Code, § 70373) on Jacob.  Relying on *Dueñas*, he contends these should be stayed pending a hearing to determine his ability to pay them.

*Dueñas* held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes [these] assessments." (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)  With respect to the minimum restitution fine, the court held imposition of this fine without first determining ability to pay, while done in accordance with the statutory scheme, also violated due process; execution of such a fine "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid*.)

Authority is presently split over whether a defendant who did not object to the trial court's imposition of mandatory fines and fees based on inability to pay, such as defendant failed to do for the restitution fine, forfeits a *Dueñas* claim.  (Compare *People v. Frandsen* (2019) 33 Cal.App.5th 1126 [finding forfeiture] with *People v. Castellano* (2019) 33 Cal.App.5th 485 [no forfeiture].)  We conclude Jacob's *Dueñas* challenge is forfeited.

Section 1202.4 expressly allows a trial court to consider a defendant's ability to pay when determining whether to increase the restitution fine above the statutory

minimum. (§ 1202.4, subd. (c).) That statutory minimum is $300. (§ 1202.4, subd. (b)(1).) Here, the trial court imposed a restitution fine in the amount of $10,000, far more than the statutory minimum. Thus, Jacob could have objected to this fine based on inability to pay but failed to do so, forfeiting his challenge to this fine on inability to pay grounds. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [challenge to restitution fine based on inability to pay forfeited where trial court imposed maximum fine and the defendant did not object on that basis below]; *People v. Frandsen, supra*, 33 Cal.App.5th at p. 1153.)

Although there is no similar implicit finding of ability to pay for the two assessments, the trial court's implicit determination Jacob could pay a $10,000 restitution fine likewise encompasses a finding Jacob has the ability to pay the two much smaller assessments. The *Dueñas* contention is forfeited.

VIII

*Re-argument*

Jacob and Sydnor both raise contentions regarding the trial court's decision to allow re-argument in response to the jury's inquiry regarding its inability to reach a verdict on Jacob's firearm enhancements.

A. *Background*

During deliberations, the jury asked the trial court what it should do if the jurors agreed on a verdict for the murder and robbery charges against Jacob in counts one and two, but could not agree regarding the use of firearm allegations for those charges. After conferring with counsel, the court told the jury it could let the court know if it believed additional instruction or argument on the firearm allegation would be helpful in reaching a unanimous agreement, or, if the jury did not believe additional instruction or argument would be helpful, then complete the verdict forms for the charges and special circumstances the jury agreed upon, and inform the court about the inability to agree on the firearm allegations. While conferring regarding the response to the jury's inquiry,

25

counsel for Sydnor stated, "I'm, not sure I have standing to argue co-defendant's enhancement issues."

The following day, the jury asked for additional arguments to help them determine whether Jacob was the second person in the house in order to resolve the firearm allegations. The trial court directed that all counsel be notified to come to court, and to inform Sydnor's counsel that his presence was not necessary if he did not believe it was needed.

The prosecutor and Jacob's counsel presented additional arguments, after which the jury deliberated for about 30 minutes. Although both arguments mentioned Sydnor, neither Sydnor nor his counsel was present. The jury went home early and was subsequently put on hold.

The following morning, the trial court announced that Sydnor's counsel had not been informed of re-argument because the e-mail intended for him was sent to another attorney. This led the court to mistakenly conclude Sydnor's counsel did not wish to appear for re-argument. The court asked Sydnor's counsel to come in, gave Sydnor's counsel a copy of the prior day's proceedings, and informed counsel of the mistake. It apologized to counsel and explained why it thought counsel did not want to appear because counsel had sent no response.

The court next told the jury that due to the court's error, Sydnor's counsel was not given notice of the prior day's proceedings, and that Sydnor should have been there even though the jury's question related only to Jacob. Sydnor moved for a mistrial, which the court denied, finding Sydnor's counsel agreed to the court's response to the jury question, any additional objection counsel could have made to reopening argument would have been denied, and the references to Sydnor in the re-arguments were inevitable and fair, given the nature of the case.

After the court reminded the jury that these problems were the court's fault, Sydnor's counsel was allowed to make a supplemental argument addressing what the

26

prosecutor and Jacob's counsel had argued the day before. The trial court subsequently instructed the jury that the arguments from the last two days were in response to the request for additional argument regarding the Jacob firearm enhancements, and it was not to consider this argument on any other issue, "particularly any other issue that would relate to Mr. Sydnor." The court also re-instructed the jury what the attorneys say is not evidence, and if any of the original arguments or re-arguments differ from how it remembers the evidence, the jury can ask for a readback of that part of the evidence.

Sydnor subsequently moved for a new trial based on the lack of his and his counsel's presence at critical stages during the re-argument proceedings. The trial court denied the motion.

B. *Jacob: Re-Argument Unauthorized*

Jacob contends the trial court erred in allowing re-argument without determining whether an impasse existed. We disagree.

"After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict." (Cal. Rules of Court, rule 2.1036(a).) If the court determines further action may assist the jury in reaching a verdict, it may avail itself of several options including permitting the attorneys to present additional argument. (Cal. Rules of Court, rule 2.1036(b)(3).)

We review a court's determination under rule 2.1036 of the California Rules of Court for abuse of discretion. (*People v. Salazar* (2014) 227 Cal.App.4th 1078, 1087-1088.)

The jury here informed the court it could not reach a verdict on Jacob's firearm enhancements. The court, with the assent of counsel, asked the jury if it needed further instruction or argument, or whether such would not help it reach a verdict. It allowed

27

further argument only after the jury asked for it in response to the court's answer. Under these facts, the court was within its discretion to determine the jury was at an impasse regarding the firearm enhancements and additional argument on that subject was the appropriate means for addressing the impasse.

C. *Sydnor: Right to Counsel and Personal Presence*

Sydnor contends the trial court erred in denying his motion for a new trial because has was deprived of his rights to be personally present and have counsel at a critical stage of the proceedings.

"A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial. For purposes of the right to be present, a critical stage is 'one in which a defendant's " 'absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " ' [Citation.] As to the right to counsel, a critical stage is one 'in which the substantial rights of a defendant are at stake' [citation], and 'the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial' [citation]." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465.)

Due to the trial court's inadvertent error, Sydnor and his counsel were not present at stages critical to Jacob but not to him. Whether the jury could reach a verdict on Jacob's firearm enhancement allegations was obviously a critical stage to Jacob, but Sydnor's substantial rights were not at stake and neither his nor his counsel's presence was necessary to ensure those proceedings or his trial's fairness. Sydnor's counsel essentially admitted this at the initial discussion of the jury's question, when counsel questioned whether he even had standing to question the court's response to the jury's inquiry. In addition, Sydnor's counsel did not object to the court's reply to the jury question in which it gave the jury the option to ask for additional argument. Also, the court later ruled that any objection of Sydnor's counsel to allowing additional argument

28

would have been fruitless. Taken together, these facts show neither the presence of Sydnor nor his counsel was necessary at these proceedings on a matter tangential to him.

The only part of the actual re-argument relevant to Sydnor's case was that he was mentioned by both Jacob's counsel and the prosecutor in their re-arguments.[3] The trial court afforded Sydnor an opportunity to respond once the error was discovered, explaining to the jury why Sydnor's counsel did not participate in the re-argument and allowing Sydnor's counsel to present additional argument. Although Sydnor was mentioned by Jacob's counsel and the prosecutor in their re-arguments, the court instructed the jury it was to consider the re-argument only to the firearm enhancement allegations for Jacob, and that the arguments of counsel did not trump the facts adduced at trial. In the absence of evidence to the contrary, we presume the jury followed the instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.)

Snydor's counsel may not have been present when Jacob's counsel and the prosecutor re-argued Jacob's gun enhancement allegations, but he was not deprived of counsel or the right to be present at a stage of the proceedings critical to him. The combination of allowing Sydnor's counsel to present additional argument and the court's instructions limiting the additional argument to Jacob's firearm enhancements neutralized any possibility that Sydnor had any interest that could be adversely affected by his and counsel's absence from the re-argument. While, as the trial court admitted, it is better

---

[3]     The prosecutor's re-argument made numerous references to Sydnor, stating Regina would not recognize Sydnor because he wore a mask, she was hesitant to identify Jacob because the other perpetrator, Sydnor, had not been caught yet, Sydnor was in the van because he was in the driver's seat surveillance, made three other references to Sydnor being in the van, noted the numerous calls between Sydnor, Jacob, and Lisa, noted Sydnor did not know anyone in California and it would be difficult for Jacob to find someone to accompany Sydnor to the murder, and related a hypothetical showing it would be nonsensical for Sydnor to commit the murder with someone he did not know. Jacob's counsel argued the crimes "could as easily have been driven by Mr. Sydnor on his own without Mr. Jacob's participation."

practice to allow counsel and codefendant to be present at such a proceeding, this was not the deprivation of the right to counsel or personal presence at a critical stage of the proceedings. Accordingly, there is neither prejudice nor structural error.

D. *Jacob: Prosecutorial Misconduct During Re-Argument*

1. *Background*

During re-argument, the prosecutor argued, regarding Regina's testimony, that she:

"[T]akes the stand and says, I know Mr. Jacob, albeit briefly from some interactions with Byron, that if she knows him and says that person in the courtroom is not him due to bushy eyebrows and complexion, that would be reasonable doubt. She knows him. She says it's not him.

"The flip side is if you look at the circumstance of this case, if she knows him and knows what he just did, albeit come in with a mask, killed Byron and then fled, and someone, this person, opened the door back up and saw her going out the back bedroom, and thought he was coming back in to kill her, from that point on, she knows what that person is capable of.

"So put that in, when we think about this, on whether if you look at it, she knows him and says it's not him, or she knows him and does not want to say it's him, let's see which one makes more sense."

The prosecutor asserted regarding Regina's failure to identify Jacob in a lineup: "Her description at the time with the patrol officer at the scene, she didn't give a description of bushy eyebrows of the person, dark complexion. They're not going to put Anthony Jacobs in a lineup with no eyebrows and the skin complexion he has. The evidence shows that that came through her multiple interviews later on." The prosecutor then claimed that Regina was motivated by a fear of the not yet identified second assailant during this time, and explains why she now said, "the person had darker complexion than Anthony Jacob."

30

The next day, after the prosecutor's and Jacob's re-argument had concluded, Jacob's counsel asserted the prosecutor misrepresented the facts during re-argument by claiming Regina's description of the assailant at trial differed from her initial description of the man. Counsel argued that the prosecutor's initial assertion regarding bushy eyebrows and dark complexion was "absolutely false," as an officer's summary of Regina's statement states she said the assailants were "both black men with dark complexion." Jacob's counsel characterized the prosecutor's statement that Regina now says the person had a darker complexion than Jacob was also wrong as Regina initially told law enforcement the first guy was tall and dark, kind of like her son, which tracked her testimony. Jacob's counsel asked for additional argument or a mistrial in the alternative. When the trial court asked Jacob's counsel why the prosecutor's statements, to the extent they could be prejudicial, "cannot be cured with a repetition of the instruction that what the attorneys say is not evidence," Jacob's counsel replied, "that's a method of curing this issue. I think a more direct and appropriate method is to allow additional brief argument in response to these comments." The trial court denied the motion for mistrial or additional argument. The court then addressed the failure to inform Sydnor's counsel of re-argument and, after Sydnor's counsel gave his additional argument, reinstructed the jury that the attorney's arguments were not evidence.

2. *Analysis*

It is misconduct for the prosecutor to misstate the facts of the case. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) A failure to object to misconduct during argument is forfeited unless the misconduct is so egregious it could not be cured through admonition. (*People v. Collins* (2010) 49 Cal.4th 175, 233.)

To the extent Jacob's claim was not forfeited by raising a contemporaneous objection during the prosecutor's argument, it was cured by the trial court's subsequent reminder to the jury that the attorney's arguments were not evidence. The alleged misstatements were made regarding evidentiary details, whether the eyewitness's

31

description of one of the assailants to law enforcement and at trial conflicted and what description she made.  Even if we were to characterize this as misconduct, it is not of the type that was not cured by the court's admonition.

IX

*Sydnor's Suppression Motion*

Sydnor filed a motion to suppress evidence seized pursuant to a search warrant issued by a magistrate in Philadelphia.  The motion alleged that, on July 7, 2015, several detectives from the Sacramento County Sherriff's Department were in Philadelphia and enlisted the aid of the Philadelphia Police Department in obtaining the warrant.  Attached to the motion and the prosecution's opposition were the search warrant and documents upon which it was based.

At the hearing on the motion, Detective Turnbull testified that he prepared an affidavit that was presented to the magistrate in Philadelphia, but did not recall whether he signed it.  He was sworn in at the Philadelphia proceeding and knew the magistrate there reviewed the affidavit.  The original affidavit should be in Pennsylvania.

Sydnor's counsel argued that he wanted to determine whether "there's anything sworn or any documentation from the Philadelphia courts, either sealing the affidavit or anything indeed shows it's relied upon beyond just the testimony from Detective Turnbull."  The trial court denied the motion without prejudice.

Sydnor's counsel subsequently made several requests for the trial court's help in obtaining documents in Philadelphia relating to the warrant.  After the first request, Sydnor's counsel later told the court, "What is in the court file is three warrants, the continuing probable cause, which was penned by the Philadelphia detective.  There does not appear to be what we had in the motions as Exhibit B, the Turnbull affidavit.  That does not appear to be in the Philadelphia file."  Counsel told the court he was continuing his efforts to obtain information from Philadelphia, and he believed the absence of the California affidavit was telling with respect to what the magistrate considered.

Following the verdict, Sydnor's counsel moved for a new trial based on the absence of Detective Turnbull's affidavit from the Philadelphia file. According to counsel, it appeared the supporting documentary basis for the search warrant was the affidavit from the Philadelphia detective.

The trial court denied the motion, finding the request for the warrant by the Philadelphia officer referred to an affidavit by Sacramento officers detailing the evidence establishing probable cause, Detective Turnbull testified that he was present when the Philadelphia magistrate had issued the search warrant, the magistrate had his affidavit, and he was sworn by the magistrate.

Sydnor claims the trial court erred as the Philadelphia magistrate improperly relied on unsworn evidence to issue the search warrant.

Although Sydnor presents no authority that the warrant was improper under Pennsylvania law or any authority supporting the proposition that a search warrant issued by a court in another state must follow California procedure, we shall assume for this case that the warrant here was bound by California law.

"A search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person to be searched or searched for, and particularly describing the property, thing, or things and the place to be searched." (§ 1525.)

Although Detective Turnbull's signed affidavit was missing, the trial court was presented by the signed affidavit from a Philadelphia Detective relating that Sacramento detectives told him about the murder, Regina's description of two gunmen with their physical descriptions, the surveillance video of the van, and Sydnor being identified as the driver. This affidavit also describes additional investigation of the Philadelphia detective tying Sydnor to the residence to be searched. It also specifically referred to the Sacramento affidavit.

As noted in our discussion of Jacob's suppression motion, we defer to the trial court's factfindings in ruling on the suppression motion so long as they are supported by

33

substantial evidence. In addition, the defendant bears the burden in attacking the legality of a warrant. (*People v. Fish* (2018) 29 Cal.App.5th 462, 468.)

Detective Turnbull testified that the Philadelphia magistrate considered his affidavit, and that he was present and sworn in when it was considered. The signed affidavit by the Philadelphia detective related some of the Sacramento investigation and referred to Detective Trunbull's affidavit. The hearsay statements in this affidavit may support a probable cause finding. (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 576.) Substantial evidence supports the trial court's finding that the Philadelphia warrant was issued based on affidavits establishing probable cause, and we find Sydnor failed to carry his burden of establishing the contrary.

X

*Senate Bill No. 620*

Both defendants contend the matter should be remanded to allow the trial court to exercise its discretion on whether to strike the firearm enhancements. The Attorney General concedes the point.

On October 11, 2017, the Governor signed Senate Bill No. 620. As relevant here, Senate Bill No. 620 provides that effective January 1, 2018, sections 12022.53 and 12022.5 are amended to permit the trial court to strike an enhancement in the interests of justice. (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Prior to this amendment, an enhancement under sections 12022.53 and 12022.5 was mandatory and could not be stricken in the interests of justice. (See, e.g., *People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363; *People v. Felix* (2003) 108 Cal.App.4th 994, 999.)

The amendment to sections 12022.53 and 12022.5 applies retroactively to cases not final on appeal. (*People v. Arredondo* (2018) 21 Cal.App.5th 493, 507; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) When a trial court is unaware of sentencing discretion, the appropriate remedy is to remand for the court to exercise its discretion. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) In the case of Senate

Bill No. 620, a remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement.  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 427-428.)

Since the trial court did not indicate in any way remand would be futile, we shall remand for the trial court to exercise its discretion over the enhancements.

DISPOSITION

The matter is remanded to the trial court to consider whether to exercise its discretion to strike defendants' firearm enhancements.  The judgment is otherwise affirmed.

/s/_____

BLEASE, Acting P. J.

I concur:

/s/_____

HULL, J.

ROBIE, J., Concurring and Dissenting.

I concur fully in all parts of the Discussion except part VII addressing defendant's argument that *Dueñas* calls into question the imposition of the $10,000 restitution fine, $120 court operations assessment, and $90 court facilities assessment without a determination of his ability to pay. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157.)

As to part VII, I concur and dissent. I concur in the majority's conclusion that defendant's challenge to the restitution fine is forfeited because an objection must be made in the trial court to preserve a challenge to the imposition of a restitution fine in excess of the mandatory minimum on appeal, and defendant failed to do so. (*People v. Nelson* (2011) 51 Cal.4th 198, 227.) I dissent to the majority's conclusion that defendant's *Dueñas* claim as to the assessments was forfeited. I agree that, as stated in *Castellano*, a trial court is required to determine a defendant's ability to pay only if the defendant raises the issue, and the defendant bears the burden of proving an inability to pay. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) In the absence of authority invalidating the challenged mandatory assessments on inability to pay at the time the trial court imposed it, however, defendant could not have reasonably been expected to challenge the trial court's imposition thereof. (*People v. Welch* (1993) 5 Cal.4th 228, 237 ["[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].)

I believe a limited remand under *Dueñas* is appropriate to permit a hearing on defendant's ability to pay the challenged mandatory assessments because his conviction and sentence are not yet final. (See *People v. Castellano*, *supra*, 33 Cal.App.5th at pp. 490-491.)

　　　　　　　　　　　　　　 /s/
　　　　　　　　　　　　　ROBIE, J.

1